CP:BSK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against-

JULIAN HURTADO,

        Defendant.

- - - - - - - - - - - - - - - -X
EASTERN DISTRICT OF NEW YORK, SS:

**M-07-408**

**To Be Filed
Under Seal**

AFFIDAVIT IN SUPPORT OF
ARREST WARRANT

(Title 18, U.S.C., §§
1956 (h))

     William Gunther, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and says:

     On or about and between July 1, 2006 and March 16, 2007, within the Eastern District of New York and elsewhere, the defendant JULIAN HURTADO and others did knowingly and intentionally conspire to conduct financial transactions affecting interstate and foreign commerce involving property, to wit: monetary instruments and funds, to wit: approximately $50,000 in United States currency, represented by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of this section, to be the proceeds of a specified unlawful activity, to wit: narcotics trafficking, to avoid a transaction reporting requirement under

State and Federal Law, in violation of Title 18, United States Code, Section 1956(a)(3)(c).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

The source of Your deponent's information and the grounds for his belief are as follows:

1. I am a Special Agent of the DEA, duly appointed according to law and acting as such. I have been a DEA Special Agent for approximately two years and am currently assigned to the NJ Division DEA, which is located in Newark, New Jersey. As a Special Agent with the DEA, I am tasked with investigating narcotics trafficking, money laundering and other offenses. During my tenure with the DEA, I have participated in numerous narcotics and money laundering investigations during the course of which I have conducted physical and wire surveillance, executions of search warrants, and reviews and analyses of numerous taped conversations and records of drug traffickers and money launderers. Through my training, education and experience -- which has included numerous instances of debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, conducting searches of locations where drugs and money have been found, and conducting surveillance of individuals engaged in drug trafficking and money laundering -- I have become familiar with the manner in which illegal drugs are

imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement.

**MONEY LAUNDERING AND THE CURRENCY BLACK MARKET**

2. Money launderers and drug traffickers frequently use the service of money brokers to return drug proceeds to Colombia. These brokers have developed a system to bypass the Colombian banking system and the scrutiny of Colombian authorities, and are able to deal directly with the narco-traffickers who wish to sell their U.S. based drug dollars.

3. The process works as follows. A Colombian business person purchases goods for import into Colombia. These goods must be paid for in dollars, as the exporter will not accept payment in pesos. The Colombian business person purchases dollar denomination negotiable instruments from money brokers in Colombia. These instruments include money orders, checks drawn on dollar accounts, wire transfers, or even cash.

4. The broker obtains these negotiable instruments or cash by contracting with the drug traffickers or their representatives who have dollars, in the form of drug proceeds, in the United States. The broker arranges for the drug proceeds to be picked up from the trafficker's U.S. representative and deposited into a bank account controlled by the broker or to be turned into other negotiable instruments, such as money orders.

The broker provides the business person with the dollar denomination instruments needed to pay the supplier, minus the commission charged by the broker. The broker pays the drug trafficker in Colombia in pesos, minus the commission charged by the broker. In this fashion, the business person obtains the dollar denomination instruments needed to pay debts and the trafficker obtains the pesos needed to operate the drug business, without bearing the responsibility of arranging for the movement of the drug dollars.

    5. Different negotiable instruments command different prices on the black market. The variation in price is directly related to market conditions, availability of a particular instrument, and the risks associated with the instrument.

    6. The Colombian business person resorts to the black market because the cost of purchasing dollars on the black market is substantially less than the cost of purchasing dollars from the Colombian Central Bank. If the Colombian importer goes to the Central Bank to purchase dollars, the importer is asked why the dollars are needed. In Colombia, there are import duties on most products; duties range from 7% to 25% of the cost of the import. The Central Bank collects that duty on behalf of the government at the time the dollars are purchased. There is also a 6% government tax on the purchase of foreign currency which the Central Bank collects on behalf of the government. Thus, the

importer must pay anywhere from 13% to 31% to purchase U.S. currency. Because no import duty or tax is imposed by the money broker, the cost of purchasing currency on the black market is substantially less. Thus, with rare exceptions, businesses will use the black market to purchase dollars when paying for imports.

7. The United States company is aware that it is receiving its payment in funds purchased on the black market because the payment does not come directly from the Colombian purchaser, and because it comes in a form not usually associated with legitimate methods of payment (i.e., structured money orders, large sums of cash in small dollar denominations delivered by a courier, etc.)

8. Brokers must employ a variety of individuals to effect the money laundering process. Some individuals are used as "pickup" people, i.e., people responsible for collecting the drug proceeds from the street sales and disposing of those proceeds as directed by either the drug cell or the money cell head. For example, a pickup person is used to retrieve the drug proceeds from the drug organization whose sales generated the currency. That pickup person typically hands off the money to a second pickup person, employed by the money launderer. In some cases, the second pickup person will launder the money as directed by the money broker, i.e. purchase the money orders, make the structured deposits, etc. In other cases, the second

pickup person will hand the money of to yet another pickup person who will launder the money.

9. Other individuals are used to maintain "stash houses" where the drug proceeds are stored prior to laundering. Others, known as "smurfs" are used to structure deposits of currency into accounts or to purchase money orders and other instruments.

10. In my opinion, and the opinion of the experts referred to above, as well as the opinion of money launderers and money brokers with whom I have spoken, the source of virtually all of the funds bought and sold on the Colombian black market is drug proceeds.

**PROBABLE CAUSE**

11. In or about July 2006, a confidential informant ("CS #1") of proven reliability[1] provided the DEA with information regarding an individual he/she identified as "JULIAN," subsequently identified as defendant JULIAN HURTADO. CS #1 stated, in sum and substance, JULIAN HURTADO was a Colombian male involved in laundering drug money through bank accounts. At the direction of DEA agents, CS #1 introduced CS #2

---

[1] During the course of the investigation, CS #1's information has been corroborated repeatedly by other evidence, including, but limited to, surveillance, undercover interactions with JULIAN HURTADO and information provided by other confidential sources.

to defendant JULIAN HURTADO as an individual who needed to move money to Colombia.

12. On or about August 7, 2006, CS #2 spoke with JULIAN HURTADO. During this conversation, CS #2 and JULIAN HURTADO agreed to meet the following day.[2] On August 8, 2006, JULIAN HURTADO and CS #2 spoke on three occasions to arrange the meeting. In one of these conversations, HURTADO asked CI #2 how to get to the meet location in New Jersey, as HURTADO was coming from Queens and did not know how to get there. On August 8, 2006, surveillance agents observed CS #2 and JULIAN HURTADO meet at the Tropicana Diner in Elizabeth, New Jersey. During that meeting, JULIAN HURTADO told CS #2 that he had auto body businesses in Cali, Colombia that he used to launder money. JULIAN HURTADO offered to take U.S. dollars in the United States, launder them through U.S. bank accounts, and pay out the money in pesos in Colombia. JULIAN HURTADO stated that he could do a $50,000 transaction in one day but if the transaction was greater than $50,000, he would have to use several accounts and spread the transactions out over a period of days to avoid suspicion. JULIAN HURTADO told CS #2 that he charged 10% to launder money but in the case of amounts greater than $50,000, the fee would be 9%. JULIAN HURTADO told CS #2 that whoever CS #2 designated in

---

[2] Most of the conversations referenced in this affidavit were recorded and a Spanish speaking agent has reviewed the recording.

Colombia could pick up the money. CS #2 stated that he would call JULIAN HURTADO when he had money to launder. During this meeting, CS #2 stated to JULIAN HURTADO, in sum and substance, that JULIAN HURTADO knew where this money was coming from and therefore, they had to be careful. JULIAN HURTADO responded, in sum and substance, yes, I understand.

13. On November 14, 2006, CS #2 spoke with JULIAN HURTADO. In that conversation, CS #2 told JULIAN HURTADO that he had $50,000 that he needed laundered to Colombia. CS #2 and JULIAN HURTADO agreed to meet the following day. The following day, JULIAN HURTADO and CS #2 spoke again. In that conversation, the two agreed to meet the next day.

14. On November 16, 2006, CS #2 met with JULIAN HURTADO at the Tropicana Diner in Elizabeth, New Jersey. At that time, JULIAN HURTADO arrived in a car registered to his name; there was an unidentified female in the passenger seat. JULIAN HURTADO exited the car and approached CS #2. After greeting each other, JULIAN HURTADO and CS #2 walked to the passenger side of CS #2's car. CS #2 opened the passenger door and retrieved a plastic bag which contained a shoe box. Inside the shoe box was $50,000 in undercover funds. CS #2 again emphasized that JULIAN HURTADO needed to know where this money was coming from and therefore, to be careful. JULIAN HURTADO responded, in sum and substance, yes, I understand. JULIAN HURTADO took the plastic

bag and handed it to a female who was a passenger in his car. HURTADO asked CS #2 if he knew where the closest Bank of America branch was located. CS #2 informed JULIAN HURTADO that there was a branch two blocks away. CS #2 asked JULIAN HURTADO to call CS #2 that evening to tell CS #2 how everything had gone. CS #2 then entered his car and drove away.

15. Surveillance agents followed JULIAN HURTADO to a Bank of America branch in the area of New Jersey. Agents observed JULIAN HURTADO enter the branch carrying a black bag. The agents observed a plastic bag sticking out of the black shoulder bag HURTADO was carrying. A DEA agent entered the bank and observed both CS #2 and the female standing at the counter inside the bank. The DEA agent observed JULIAN HURTADO make an entry into a ledger book which HURTADO then placed inside the black shoulder bag. In the agent's opinion, and based on his experience, the black shoulder bag was large enough to carry $50,000 in U.S. currency.

16. Early that evening, CS #2 spoke with JULIAN HURTADO. In that conversation, CS #2 asked JULIAN HURTADO for the name and telephone number of the person who would be delivering the pesos in Colombia. JULIAN HURTADO gave CS #2 the JOSE and a Colombian telephone number

17. On November 17, 2006, an officer with the DAS, a Colombian law enforcement agency, acting in an undercover

capacity, called JOSE over the telephone number JULIAN HURTADO had provided. The officer arranged to meet JOSE in Cali. On or about November 18, 2006, the DAS undercover officer had several conversations with JOSE for the purpose of setting up a meeting to receive the pesos.

18. On or about November 21, 2006, the undercover officer met JOSE at a mall in Cali. At that time, JOSE gave the officer the equivalent of $45,000 in pesos.

19. On December 6, 2006, the Honorable Carol B. Amon issued an order authorizing the interception of communications over T-MOBILE WIRELESS TELEPHONE (917) 849-9694, IMSI NUMBER 310260391900874, SUBSCRIBER DOB 01/01/1970, NO OTHER INFORMATION PROVIDED (the "9694 Telephone") and SPRINT WIRELESS TELEPHONE (347) 254-3116, ESN 2D296E34, SUBSCRIBED TO BY MARY RINCON, 94-26 34th ROAD, JACKSON HEIGHTS, NEW YORK, 11372 (the "SUBJECT TELEPHONE"). Agents intercepted calls over both of these telephones from December 7, 2006 to January 6, 2007. In these intercepted conversations, defendant HURTADO spoke with several individuals regarding, among other things, transactions involving the buying and selling of drug proceeds and the purchase of a house with the proceeds of money laundering and drug trafficking, using fraudulent loan documents.

20. On February 16, 2007, the Honorable Carol B. Amon issued an order authorizing the interception of communications over SPRINT WIRELESS TELEPHONE (347) 254-3116, ESN 2D296E34,

SUBSCRIBED TO BY MARY RINCON, 94-26 34th ROAD, JACKSON HEIGHTS, NEW YORK, 11372. Agents intercepted calls over both of these telephones from February 16, 2007 through March 18, 2007. In these intercepted conversations, defendant HURTADO spoke with several individuals regarding, among other things, transactions involving the buying and selling of drug proceeds.

Dated: Brooklyn, New York
March 26, 2007

_____
William Gunther
Special Agent
Drug Enforcement Administration

Sworn to before me
this 26th day of March, 2007

_____
UN                TE JUDGE
EA                W YORK